FARMERS & GINNERS COTTON OIL COMPANY, PETITIONER, *v.* COMMIS-
SIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 93436.   Promulgated February 6, 1940.

*E. L. All, Esq., A. J. Bowron, Jr., Esq.,* and *Virden Moore, Esq.,*
for the petitioner.
*Stanley B. Anderson, Esq.,* for the respondent.

OPINION.

Hɪʟʟ: The petitioner contends that the losses it sustained in its dealings in refined oil futures were normal business losses. This

claim is based primarily upon the broad hypothesis that the initial processing of raw cottonseed is so related to the manufacture of refined cottonseed oil as to make stocks of the latter product invoiceable as regular "stock in trade" of the processor. Secondarily, the petitioner contends that, in any event, its dealings in oil futures were transactions entered into for profit and that the resulting losses are deductible under section 23 (f) of the Revenue Act of 1934 as having been sustained during the taxable year and not compensated for by "insurance or otherwise."

The respondent concedes petitioner's loss but contends that its investments in refined oil futures were capital assets within the definition set out in paragraph (b) of section 117, Revenue Act of 1934, as follows:

(b) DEFINITION OF CAPITAL ASSETS.—For the purposes of this title, "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.

If the respondent is correct in his classification of these assets, his holding must be sustained since the law limits deductions for losses from sales or exchanges of capital assets to $2,000, plus gains from such transactions. Sec. 117 (d), Revenue Act 1934; *Joseph R. Seeds*, 37 B. T. A. 705. In this proceeding the burden is upon petitioner to show that respondent's classification is incorrect. *Lightsey* v. *Commissioner*, 63 Fed. (2d) 254.

The definition quoted identifies as "capital assets" property held by a taxpayer "whether or not connected with his trade or business", except stock in trade, property includable in the inventory of the taxpayer if on hand at the close of the taxable year, or property held "primarily for sale to customers in the ordinary course of his trade or business." The petitioner claims that the assets here involved were held under these excepted categories, and that its loss resulted from their "sale in the regular course of its business."

On the first point petitioner sets forth its contention in its brief as follows:

It is the primary contention of the taxpayer that its transactions in refined oil futures were essentially a part of a process of production or other acquisition of property for sale to customers in the ordinary course of its trade or business. Correspondingly, we urge that we are not dealing with capital assets, and that losses sustained are not subject to those provisions of the Revenue Act of 1934 relating to capital losses. * * *

On brief the petitioner argues two grounds to justify its claims as a manufacturer of and/or dealer in refined cottonseed oil. The

first ground is based upon the theory that the manufacture of crude cottonseed oil, being the initial and first essential step in the manufacture of the refined product, makes the processor of the first a part manufacturer of the latter. It urges in further support of this theory that refined oil is crude oil subjected to further processing and that they are essentially the same commodity in a slightly different form, refined oil being the only commercially usable form, and that, therefore, they may be interchangeably carried as stocks in trade in its invoice. We think it unnecessary to consider the theory upon which this first ground is based, because the record negatives its application to petitioner's business. The positive proof here shows that the petitioner operated what is known as an "independent cotton seed mill" without connection with or interest in refineries or the business of refining cottonseed oil. Crude oil was but one of the several products of its mill and, as were its other products, was sold for cash. True, extracting the crude oil from the seed is a step in manufacture of refined cottonseed oil and the two processings might properly be carried on as a single business, but they are separate and distinct steps, performed with different equipment and machinery and each may be conducted as a business unto itself, separate and distinct from the other. The record shows that petitioner operates an independent mill and is in no sense a refiner of crude oil, and we so hold. We also hold against petitioner's view that crude cottonseed oil and the refined product are essentially one and the same commodity. Petitioner cites G. C. M. 1582, (C. B. VI-1, p. 171) to support its contention that refined products may be carried in the invoice of the producer of the crude from which it was manufactured, in substitution for the latter, but that ruling has no application to our facts. The ruling dealt with the case of a copper mining company which exchanged its mine output of crude ore currently as mined for prices payable in copper metal from a smelting company which bought and refined the ore. The taxpayer (mining company) there derived its income from sales of the metal received for its ore and maintained regular sales agencies for disposal of the same. Being an active dealer in refined copper, upon an accrual basis, the ruling consistently held that that taxpayer should include in its year-end invoice, as accounts receivable for copper "in kind" at then market prices, all undelivered copper owing to it by the smelting company. We agree with that ruling but find no support for petitioner's position in it. The petitioner next argues that the established custom of its business, as followed by it and other operators of "independent cotton seed mills", justifies transactions in refined oil futures, as here carried on by it as necessary to a stabilization of marketing its crude oil. Under the facts here petitioner

asserts that its purchases of refined oil futures amounted to "the purchase of refined oil" or "a purchase of property for sale to customers in the ordinary course of its business."

Whatever justification the entering into of these transactions may have had from the standpoint of business necessity or custom, it is clear from the record that petitioner acquired through them no property which it held for sale to customers. It contends that the contracts amounted to purchase of refined oil, but we think otherwise. Such transactions were mere executory contracts to purchase, which it acquired with a positive intent *not to close* into completed purchases and *not* to acquire any specific commodity through them. Such conclusion as to petitioner's intent in the premises is inescapable from explanations made by its manager while testifying at the hearing. Typical is the answer made by the witness to a question asking him to explain the oft-repeated statement to the effect that through these transactions in futures crude oil sold was replaced by refined oil. The question and answer are as follows:

MEMBER: You talked about replacing it with refined oil. Do you take delivery, actual delivery, of the refined oil that you bought on futures?

WITNESS: No, sir, we did not. That would put us back in about the same position as if we would have the refined. We would have the actual oil on hand, which we would have to buy, and it is cheaper to carry it in the crude than in the refined oil.

That in such transactions the petitioner was speculating on the ultimate liquidation of its contracts, and not on commodities "in kind", is shown from these further answers of the witness to questions as follows:

MEMBER: You made a settlement of these futures purchases on the basis of the difference in the market price at the effective date of the futures purchased, and the price you paid for it?

WITNESS: Of course, you have the right to demand delivery, and if you do not want delivery, if at that time there was a satisfactory market on which to sell that contract, we would sell it, but otherwise if it was not, we might transfer it into a forward position which we do at times, still further. At the final date you do take your loss or your profit, whichever it is.

MEMBER: And your losses involved in this proceeding are losses that were sustained by reason of your transactions in these futures?

WITNESS: That is right.

In such cases it is "intent" which determines the character of transactions. *United States* v. *Amalgamated Sugar Co.*, 72 Fed. (2d) 755; *Marengo Abstract Co.* v. *Hooper & Co.*, 174 Ala. 497; 56 So. 580; *Shannon* v. *McClung*, 210 Ala. 273; 97 So. 840; *Smith et al.* v. *Odell*, 21 Ala. App. 358; 108 So. 400; *Willard Pope*, 28 B. T. A. 1255. Petitioner cites the latter case and also *United States* v. *Amalgamated Sugar Co.*, *supra*, in support of its contention, but in

each of those cases the facts differed fundamentally from the facts here and the decisions therein sustain the legal principle respecting "intent" which we here apply. The petitioner at no time during the taxable year acquired or held refined cottonseed oil for sale to customers in the regular course of its business or at all. We hold against it upon that contention.

The petitioner advances another ground for claiming these losses as related to its mill business. It claims that transactions in refined oil futures, as here carried out, supply a needful protection to such business to the same end and purpose that a business "hedge" serves manufacturers and dealers in like situations. The petitioner, in its briefs, disclaims any contention that its transactions in controversy are within all requirements of a technical business hedge, but argues in effect that they fulfill all substantial requirements of hedges, subserve the same purpose, and are as legally applicable to its business, and, therefore, should be treated under the same rule in case of losses. Reduced to its essence petitioner's contention here is that necessity and custom made transactions in refined oil futures a regular part of its ordinary business. In our opinion the record does not support such claim. True, the evidence shows that in marketing its crude oil the petitioner's business was in need of protection against fluctuating prices, but it is obvious that transactions entered into after its raw stocks were bought, processed, the crude extracted and sold, and profits or losses attributable to it made determinable, could serve no such purpose. While the purpose of the transactions in refined oil futures contracts was to counterbalance the market hazards in relation to crude oil, such transactions were independent of the petitioner's crude oil marketing operations and involved their own hazard of losses and chance of gain. Petitioner's "forward" purchases were not made when its raw stocks were acquired and its investment therein put at risk in its business. They were made after such stocks were liquidated and the turn-over in capital invested therein was complete. The transactions in futures contracts were entered into for profit, subject to the risk of loss instead of gain, but the gain or loss realized thereon in no way resulted from or was attributable to petitioner's operations in buying its raw materials, processing same, and marketing its products. The amount of gain or loss realized by petitioner on the sale of crude oil did not affect and was not affected by the amount of gain or loss realized by it on its transactions in refined oil futures.

We hold that petitioner's transactions in refined oil futures contracts were not a part of its business as operator of its cottonseed oil mill.

Referring to the remaining contention of petitioner we agree that its loss here in question resulted from transactions entered into for profit during the taxable year, and that they were not compensated for by insurance or otherwise, but this does not dispose of the issue in its favor. Petitioner's loss resulted from sale of contracts in futures which respondent contends were capital assets under section 117, *supra*. Subdivision (b) of that section defines as "capital assets" all property held by a taxpayer except (1) stock in trade of the taxpayer, (2) other property which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, and (3) property held by the taxpayer primarily for sale to customers in the ordinary course of business.

It is readily apparent from the facts here that the futures contracts were neither stock in trade of petitioner nor held by it for sale to customers in the ordinary course of business. This being true, they would not properly be includable in petitioner's inventory if on hand at the close of the taxable year.

Regardless of whether petitioner's transactions in such futures contracts constituted a trade or business, such contracts were nevertheless capital assets within the definition of section 117 (b), *supra*. Such contracts were choses in action bought and sold only on a produce exchange through brokers. Petitioner bought and sold such futures contracts on its own account only and not for customers. It held no oil futures in stock for sale to customers and, therefore, had no right to include them in an inventory. Cf. *Francis M. Weld*, 31 B. T. A. 600; *Adirondack Securities Corporation*, 23 B. T. A. 61; *Oil Shares, Inc.*, 29 B. T. A. 664. We sustain respondent's determination herein.

*Decision will be entered for the respondent.*