ERNEST VICKERS, JR., AND ELIZABETH VICKERS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 13148–78. Filed February 14, 1983.

*William Caldwell Hancock*, for the petitioners.
*Isham B. Bradley*, for the respondent.

PARKER, *Judge*: Respondent determined a deficiency in petitioners' 1974 Federal income tax of $319,739.09. The sole issue for our decision is whether the net losses petitioners suffered speculating in commodity futures are deductible as ordinary losses or as capital losses.

### FINDINGS OF FACT

This case was submitted without trial on a full stipulation of facts. The facts to which the parties have stipulated are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioners Ernest Vickers, Jr., and Elizabeth Vickers are husband and wife. On the date they filed their petition in this case they resided in Huntingdon, Tenn. Petitioners filed their 1974 joint Federal income tax return on the cash receipts and disbursements method of accounting with the Internal Revenue Service Center at Memphis, Tenn.

During 1974, Ernest Vickers, Jr. (hereinafter petitioner), was the president and sole stockholder of Vickers Motors, Inc., a Tennessee corporation that operated a retail automobile and motorcycle sales agency in Huntingdon, Tenn. Petitioner also operated a large farm from which he produced and sold soybeans, corn, cotton, and livestock.

During 1974, petitioner engaged in numerous transactions in the commodity futures market through two securities dealers: Hornblower & Weeks—Hemphill Noyes, Inc. (Hornblower & Weeks), and A. G. Edwards & Sons, Inc. (Edwards). During 1974, petitioner entered into commodity futures transactions involving soybeans, corn, cotton, hogs, cattle, wheat, and plywood. As a result of these transactions, petitioner incurred net losses (including commission expenses) of $594,982.38. These transactions were consummated through Hornblower & Weeks and Edwards. Petitioner entered into these commodity futures transactions for profit.

During 1974, petitioner and each of the above-named securities firms were parties to certain basic agreements and understandings which, together with the trading rules of the commodities exchanges utilized, governed their rights and obligations with respect to trading by petitioner through such dealers in commodity futures.

Each commodity futures contract into which petitioner entered was one of two types— (1) a "sell" (or "short") contract under which he was obligated to deliver a stated quantity of the underlying commodity at a specified date in the future in exchange for a receipt of a stated price; or (2) a "buy" (or "long") contract under which he was obligated to purchase and accept delivery of a stated quantity of the underlying commodity at a specified date in the future in exchange for payment of a stated price. In the nomenclature of the trade, a person who has entered into a "sell" contract holds a "short position" in the underlying commodity, and a person who has entered into a "buy" contract holds a "long position" in the underlying commodity. A "short position" or "long position," unless and until closed by entering into an offsetting contract or performed by delivery, is termed an "open position." In statements of account and confirmations furnished to petitioner by either Hornblower & Weeks or Edwards, each contract was identified by date, type (i.e., "buy" or "sell"), underlying commodity, contract quantity, month specified for delivery, and price.

The nature, method, and process of handling commodity futures transactions are as described hereinafter: [1] A commod-

---

[1] The following findings are based upon an excerpt from "Commodity Futures as a Business Management Tool" by Henry B. Arthur, George M. Moffett Professor of Agriculture and Business, Emeritus, published by the Division of Research, Graduate School of Business Administration, Harvard University (1971). The parties stipulated that the contents of this document are to be taken by the Court as evidence truthfully establishing the matters set forth therein as fully as if established by testimony in open court. The parties stipulated that this material is to be considered "to only describe the process of making commodity futures trades, and shall not be binding on the parties insofar as it expresses or purports to express legal opinions as to timing, recognition or nature of gains and losses incurred by futures traders." The Court has made the findings requested by petitioner, but the Court has been favored with little or no analysis of these facts in the parties' briefs. On brief, petitioner concedes that the facts in this case are essentially the same as the facts in *Covington v. Commissioner*, 42 B.T.A. 601 (1940), affd. on this issue 120 F.2d 768 (5th Cir. 1941), cert. denied 315 U.S. 822 (1942). Thus, while the facts in the present case may be set forth in somewhat greater detail than in the earlier case, we have not been directed to, nor have we found, any material difference in the facts of the two cases.

ity futures contract consists of a firm, legal agreement between a buyer (or seller) and an established commodity exchange or its clearinghouse whereby the trader agrees to accept (or deliver) between designated dates, a carefully specified "lot" of a commodity meeting the quality and delivery conditions prescribed by the commodity exchange, with cash settlement on delivery date at a settlement price to be prescribed. The trader agrees to an arrangement with a qualified broker (or the clearinghouse) to provide him with a margin deposit as required, and also agrees to reimburse him or accept credit for all interim gains or losses in value of that futures contract resulting from day-to-day changes in its price on the floor of the established commodity exchange. The trader has an option which permits him to close out his contract at any time (at the market) simply by notifying his broker of his desire; and, on the other side, it permits the broker to close out the commitment if the margin is impaired by disposing of the contract at the market. The operations of the commodity exchanges are subject to various published trading rules, legal provisions, and regulations which may restrict individual trading in various ways. These rules may originate from the exchange or from the Government. The individual entering a contract may be dealing directly with the commodity exchange clearinghouse (if he is a clearing member), or he may be dealing through a broker (or commission firm), in which case the exchange clearinghouse holds the broker or commission firm responsible for the transaction.

Use of commodity futures contracts consists of entering a commitment (to buy or sell), of closing out an open commitment, or of making or receiving delivery in accordance with the terms of an open commitment. The required margin deposit is maintained at a prescribed level at all times, as prices go up or down. Trading is open to anyone who can meet the margin and other requirements as specified by a qualified broker.

There are two major dimensions of the commitment undertaken in the purchase or sale of a commodity futures contract. It can be considered a dual contract or at least a contract which stands on two equally important legs. The first leg is the commitment on the part of a "short" to deliver a commodity meeting the exchange specifications at a designated future

date (and a matching commitment by someone taking a long position). This part of the contract merely promises delivery of the goods; the price at which the delivery occurs will be dependent not upon the price at which the commitment was entered but upon the settlement price at the time of delivery. There is a "settlement price" declared at the end of each trading session and all accounts are brought to this level. For transactions within the day, such as a new contract bought, that trade is moved from the transaction price to the day's settlement price, which ordinarily reflects the closing quotation or quotations on the trading floor. This is the same settlement price that is used in making deliveries that occur within that trading day. The second leg of the contract involves a promise to keep up with daily price adjustments as quoted on the exchange through payment or receipt of cash at the clearinghouse window. This daily settlement process has the effect of maintaining the validity of the delivery promise so that any cancellation of the delivery commitment can be accomplished without further transfer of funds. A transaction in commodity futures (unless and until settled by delivery) does not involve an exchange of any substantive value since only the process of daily adjustment generates income or loss.[2] Nothing is borrowed in order to finance a purchase or sale of commodity futures, although a good-faith margin deposit is required of the buyer and seller. There are no debit balances in the entire futures operation other than the daily payment requirements which have to be made in cash; all net balances of traders are on the credit side and the trader is never allowed to be in debt.

Most commodity futures contracts are terminated without actual delivery of the commodity. Such termination can be

---

[2]This and the next two sentences are the portions of Professor Arthur's article to which respondent objected as legal conclusions. See note 1. The Court has found these sentences as facts (with additions of those portions of the material that petitioner chose to delete from his requested finding). However, the Court regards these statements merely as a part of the mechanics of the operation of the commodity exchange clearinghouse. To the extent that these statements purport to show, for Federal tax purposes, that there is no exchange of "any substantive value" unless or until the commodity futures transaction is "settled by delivery," we are not bound by Professor Arthur's opinion of the law. Also, since the Court cannot question the professor as to his meaning and has only the printed words of his article to rely upon, the Court regards his statements as merely his opinion as to the mechanical functioning of the commodity exchanges, which would not determine the timing, recognition, or nature of an individual trader's gains or losses.

accomplished at the request of the trader simply by notifying his broker of his desire to terminate at a price in line with current quotations in the futures market. It can also be terminated by the broker if the customer fails to make prompt payment of any amounts due the broker as a result of day-to-day price changes. If actual delivery of the commodity is made, the final daily settlement price adjustment is applied to the contract, and then the seller, in order to meet his contract obligation, supplies the commodity and receives a price for it based upon the same settlement quotation determined on the exchange. The delivery process is officially initiated by the holder of a short contract who files a notice of intention to deliver through the clearinghouse. There is always a corresponding holder of a long position who must accept this deliverable commodity and pay the prescribed current settlement price subject, of course, to any quality discounts or premiums that may apply.

The essence of the commodity futures contract can be illustrated by tracing a single transaction. Assume that a trader instructs his broker to buy one contract—representing 5,000 bushels—in December Wheat at $1.50 at Chicago. The broker (being assured that his customer has a sufficient uncommitted credit balance, or satisfied that a cash deposit will be made promptly to cover the initial margin) instructs his floor trader to make the purchase at that price. The trade will be made only if a seller is available and willing to trade at $1.50 or under. (The seller may be entering a new short contract position or surrendering a previously held long contract. In either event, the transaction will only take place when two traders, a buyer and a seller, get together.) Up to this point, the clearinghouse is not involved. However, once the trade is consummated on the exchange floor, the clearinghouse takes over as intermediary.[3] It enters on its books the obligations—one long and one short—of the two brokers who made the trade. If the brokers are not clearing members, each must have a clearing member who acts on his behalf. A "clearing member" may handle accounts of other (nonclear-

---

[3]Petitioner requests the Court to find as a fact the textbook references cited by Professor Arthur in his footnote to this statement, which the Court declines to do. Those textbook excerpts were neither furnished to the Court nor discussed in any way in petitioner's briefs.

ing) members as well as its own, thus reducing the number of accounts carried by the clearinghouse.

Once the clearinghouse has confirmed the trade and the specific price at which it was entered, the individual transaction loses its identity *so far as the clearinghouse, itself, is concerned.* At that point, the identity of the seller who was paired up with this particular buyer is of no concern to the clearinghouse. Instead, each party is directly obligated to the clearinghouse. Each party (through his clearing member) is held responsible for maintaining an unimpaired credit balance sufficient to cover the required deposit against all open commitments. This deposit (which, for regulated commodities at least, must be maintained in segregated funds by all parties) is charged each day with the amount by which prices changed that day. The clearinghouse has records for each clearing member to show all aggregate positions, long and short, for which that member is responsible. It does not care at what prices these contracts were initially entered, because each one has been brought up to the previous night's settlement price, and the accounts are charged and credited daily. Since there is a short for every long contract, the clearinghouse is always in balance with a zero net position, with respect to both the number of contracts and dollars. The clearinghouse can thus operate without having any record to identify the original price at which a particular contract was entered. *This is a matter for the broker and the trader, not the clearinghouse.* By virtue of the process of making cash settlements each day to reflect the daily price changes on the exchange floor, all profits and losses are settled at once—all losses are paid and profits are credited. Any two positions, one short and one long, in a particular contract can be paired up and closed out simply by a "close-out" transaction without any additional cash changing hands (except for commission charges and any price differences since the previous night's settlement quotations). In fact the close-out operation releases back to the traders the cash they had deposited as their required margin.

If the buyer who entered a long commitment in December Wheat at $1.50 decides to take delivery, he will receive, through the clearinghouse, a notice of intention to deliver from a seller, which in effect does two things. First, it closes out the buyer's contract account with the clearinghouse on the

specified settlement date and at the settlement price set on that date. This cancels the buyer's obligation to make further daily settlements at the clearinghouse. (Matching this action, a short contract was canceled when the wheat delivery tender was presented.) The second part of the delivery process is the actual change of title of the wheat delivered and the payment of cash to the party making the delivery. This is accomplished by use of the same settlement price as that which closed out the futures contracts, namely, the current price on the exchange for a "par delivery" quality and location of wheat deliverable under the rules of the exchange, adjusted for whatever prescribed premiums and discounts apply to the grain actually delivered.

It can be seen that the trader who originally went long at $1.50 per bushel may have had to pay a very different cash price when he took delivery—perhaps $1.75 or $1.25 depending upon what happened in the market quotations for December futures up to the time of delivery. However, he would have paid or received interim cash charges or credits which could be balanced out against the cost of his delivery wheat to give him a net cost equivalent to that at which he entered the contract.

In contrast to the accounts maintained by the clearinghouse, however, the broker has to meet the needs of his individual clients. He therefore carries a record of the individual transactions of each client in each contract classification, and he also maintains a record of the current status of the account including the daily updating of debits and credits resulting from price changes, together with the cash transfers and the net credit balances of the customer. This latter record also shows the number of open contracts in the account as a basis for calculating the credit balance required by minimum margin regulations to be checked against the actual credit balance. As stated earlier, the broker calls for more cash when margins fall below a prescribed maintenance level; otherwise he will close out enough contracts to bring the amount of margin required by the rules into line with the available credit balance. Finally, the broker customarily compiles a monthly statement for his clients, recording the summary of transactions and status of the account. This statement can be drawn up to show the results of all contract positions closed out during the month, together with cash transfers, in or out, and

the current status of open contracts, together with a summary of end-of-month credit balances and margin requirements. The broker thus is able to provide a record of all transactions, of daily results, of open commitments, or margin requirements, and of the current equity status of the account. These accounts include data showing the specific outcome of each contract entered and terminated.

During 1974, petitioner neither delivered, nor accepted delivery of, any of his commodity futures contracts as a method of performance of his obligations thereunder. Instead, each such contract or group of contracts, which when entered into established an "open position" (either "long" or "short"), was closed or offset by entering into an offsetting commodity futures contract or group of contracts having terms opposite to those of the open contract or contracts. Upon final money settlement between petitioner and his broker or security dealer, petitioner was fully relieved of any further obligations under the commodity contracts to sell or deliver commodities, those obligations being extinguished by matching his offsetting buy and sell obligations through applicable commodities exchange and clearinghouse functions and rematching the buy and sell obligations of the other parties to his offsetting contracts. Petitioner never assigned any rights in any commodity futures contracts involved in this case as a method of relieving himself of his obligations thereunder.

Each of petitioner's commodity futures contract transactions was a commodities futures contract transaction as commonly understood in commercial practice and was consummated, handled, and accounted for under the rules and regulations of the commodities exchanges and clearinghouses dealing in the particular commodities traded. There was nothing unusual about petitioner's contracts to distinguish him from any other trader in commodity futures.

On his 1974 Federal income tax return, petitioner reported his commodity futures losses as ordinary losses from hedging transactions. In his notice of deficiency, respondent determined that the futures contracts were not hedges and that the losses were from the sale or exchange of capital assets and

consequently capital losses deductible only to the limited extent provided by section 1211(b).[4] The parties have stipulated that during 1974 petitioner suffered a net loss of $594,982.38 from his transactions in commodity futures. The dispute centers upon whether this loss is properly characterized as capital or ordinary.[5]

## OPINION

Petitioner, an unsuccessful speculator in commodity futures, seeks to deduct his losses as ordinary rather than capital losses. His argument in support of such treatment is quite narrow; he says there has been no "sale or exchange."[6]

Petitioner argues that the "closing" of his "short" or "long" position in a commodity contract through the commodity exchange clearing functions or mechanism of offsetting opposing contractual rights does not constitute a "sale or exchange" as required by the general capital gains provisions (secs. 165(f), 1211, 1212, 1222), but simply constitutes a discharge or release of petitioner's obligations under each open position. Petitioner thus reasons that the commodity futures contracts have simply been extinguished through the clearing processes of the

---

[4]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable year in question, and all references to "Rules" are to the Tax Court Rules of Practice and Procedure.

[5]Since petitioners had already claimed the maximum $1,000 capital loss deduction on their return as filed, respondent disallowed the full loss of $594,982.38. See secs. 165(b), 1211(b). Respondent's disallowance of petitioners' ordinary loss thus increased their adjusted gross income and resulted in automatic adjustments of petitioners' deductions for medical expenses under sec. 213 and for charitable contributions under sec. 170.

[6]Petitioner does not argue that he was engaged in hedging transactions; he does not rely upon the *Corn Products* doctrine; and he apparently concedes, as he must, that the commodity futures contracts were capital assets in his hands. Petitioner's transactions were clearly speculative. On his tax return and in his original petition, petitioner claimed that his transactions in commodity futures qualified as hedging and therefore were entitled to ordinary loss treatment. See Rev. Rul. 72–179, 1972–1 C.B. 57, superseding and restating G.C.M. 17322, XV–2 C.B. 151 (1936). See also Rev. Rul. 78–414, 1978–2 C.B. 213. In his amended petition, however, petitioner abandoned that argument, and, in any event, the facts of record do not show any hedging transactions. Petitioner has not claimed, under the *Corn Products* doctrine, that his commodity futures transactions were integral parts of his farming or other business operations, nor would the facts of record support such an argument. *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46 (1955). Petitioner's opening brief conceded that his commodity futures contracts were capital assets but his reply brief seemed to limit the concession to those contracts representing open positions, but not the contracts entered into for offsetting purposes. This latter contention is simply part of petitioner's no "sale or exchange" argument, which will be addressed later.

commodity exchanges and that since the transactions were entered into for profit though not connected with his trade or business, therefore his losses are deductible as ordinary losses under section 165(a) and section 165(c)(2).[7]

The foundation on which petitioner erects his argument is *Helvering v. William Flaccus Oak Leather Co.*, 313 U.S. 247 (1941), in which the Supreme Court narrowly construed the term "sale or exchange." In that case, the Supreme Court held that when the taxpayer's business plant was destroyed by fire and it was compensated for the loss by insurance, there had been no "sale or exchange" within the meaning of the capital gains provisions.[8] Proceeding from that restrictive view of the "sale or exchange" requirement, petitioner points to various instances over the years where Congress has enacted statutory provisions expressly mandating "sale or exchange" treatment in certain situations.[9] Petitioner argues that no such statutory "sale or exchange" treatment has been provided for commodi-

---

[7]Sec. 165, as in effect during the year 1974, provided in pertinent part:

SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

(b) AMOUNT OF DEDUCTION.—For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

\* \* \* \* \* \* \*

(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and

\* \* \* \* \* \* \*

(f) CAPITAL LOSSES.—Losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212.

[8]It has been said that the Supreme Court's narrow construction of the term "sale or exchange" (used in the predecessor of sec. 1222) as opposed to the term "sale or other disposition" (used in the predecessor of sec. 1001(a)) in that case "created a rift between that phrase and 'sale or exchange' that has continued to this day." Bittker, "Capital Gains and Losses—The 'Sale or Exchange' Requirement," 32 Hastings L.J. 743, 745 (1981). In any event, this Court continues to be called upon to decide whether or not certain transactions constitute a "sale or exchange" so as to receive capital treatment. See *Middleton v. Commissioner*, 77 T.C. 310 (1981), affd. per curiam 693 F.2d 124 (11th Cir. 1982); *Arkin v. Commissioner*, 76 T.C. 1048 (1981); *Freeland v. Commissioner*, 74 T.C. 970 (1980) (abandonment or voluntary reconveyance of mortgaged property to creditor as "sale or exchange"); *Guest v. Commissioner*, 77 T.C. 9 (1981) (gift to charity (bargain sale) as "sale or exchange"); and *Hoover Co. v. Commissioner*, 72 T.C. 206 (1979) (offsetting of forward foreign currency sales contracts against purchase contracts for such currency as "sale or exchange").

[9]As examples of such provisions, petitioner points to sec. 165(g) (worthless stock); sec. 331

ty futures transactions and therefore concludes that no sale or exchange has occurred here. We do not agree.

Paralleling the 41-year period since the *William Flaccus Oak Leather Co.* case is the 41-year history of our *Covington* case that specifically addressed commodity futures transactions, and which neither the Supreme Court nor the Congress, in dealing with questions involving commodity futures transactions, has ever questioned. *Covington v. Commissioner*, 42 B.T.A. 601 (1940), affd. on this issue 120 F.2d 768 (5th Cir. 1941), cert. denied 315 U.S. 822 (1942).[10] Respondent has taken a consistent position throughout the years, namely that: "provisions pertaining to capital gains and losses govern gains or losses on futures contracts which are speculative." G.C.M. 17322, XV-2 C.B. 151, 155 (1936); see Rev. Rul. 72–179, 1972–1 C.B. 57, superseding and restating G.C.M. 17322 and Rev. Rul. 78–414, 1978–2 C.B. 213. Our early cases held that a speculative transaction in a commodity future was a capital transaction resulting in capital gain or loss. *Battelle v. Commissioner*, 47 B.T.A. 117 (1942); *Covington v. Commissioner, supra.* Over the years, this and other courts have consistently held that futures contracts held by a speculator are capital assets, and the gains or losses recognized are capital. *Oringderff v. Commissioner*, 48 AFTR 2d 81–5908, 81–2 USTC par. 9642 (10th Cir. 1981), affg. a Memorandum Opinion of this Court;[11] *United States v. Rogers*, 286 F.2d 277 (6th Cir. 1961), cert. denied 366 U.S. 951 (1961); *Commissioner v. Farmers & Ginners Cotton Oil Co.*, 120 F.2d 772 (5th Cir. 1941), revg. 41 B.T.A. 255 (1940), cert. denied 314 U.S. 683 (1941); *Muldrow v. Commissioner*, 38 T.C. 907 (1962). In fact, on the very narrow issue raised in this case, we held that the closing of a commodity futures transaction through the offsetting function of the exchange clearinghouse satisfies the sale or exchange requirement. *Covington v. Commissioner, supra; Battelle v. Commissioner, supra.* Thereafter, and up until this case,

---

(corporate liquidations); sec. 1231 (involuntary conversions such as that involved in the *William Flaccus Oak Leather Co.* case); sec. 1234(a) (loss or lapse of an option); sec. 1235 (transfers of patent rights); and sec. 1241 (certain lease cancellation payments by a lessee).

[10] We decided *Covington* before the Supreme Court decided the *William Flaccus Oak Leather Co.* case. The Fifth Circuit affirmed our holding subsequent to the Supreme Court's decision, and the Supreme Court thereafter denied certiorari in the *Covington* case.

[11] See *Oringderff v. Commissioner*, T.C. Memo. 1979–93.

litigants have focused upon the exceptions to the general rule of capital treatment, claiming that the commodity futures were hedging transactions, inventory (e.g., stock in trade or items held for sale in the ordinary course of business (see sec. 1221 (1))), or assets integral to the taxpayer's trade or business, i.e., the *Corn Products* rule. *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46, 52–54 (1955).[12]

Petitioner acknowledges the substantial line of authority cited above, particularly our *Covington* case, but seriously urges that those cases are all based on a fundamentally unsound premise, namely, that the offset transaction constitutes a sale or exchange. Petitioner argues that *Covington*, the case holding that the acquisition of an offsetting position to close a futures contract constitutes a sale or exchange, was wrongly decided. He asserts that the Court's reasoning in holding the offset transaction to be a sale or exchange was based on a legal fiction that does not comport with economic reality. According to petitioner, the economic substance of the transaction is the receipt or payment of money for the discharge of a contractual obligation or the release of a contractual right. He concludes that transactions involving the discharge of contractual obligations or the release or extinguishment of contractual rights involve the recognition of ordinary gain or loss. In support of this argument, petitioner cites a series of opinions by the Second Circuit, none of which involved commodity futures contracts. *Commissioner v. Pittston Co.*, 252 F.2d 344 (2d Cir. 1958), cert. denied 357 U.S. 919 (1958) (payment for surrender of rights under exclusive contract to purchase coal); *General Artists Corp. v. Commissioner*, 205 F.2d 360 (2d Cir. 1953), cert. denied 346 U.S. 866 (1953) (assignment by musical booking agent of his management contracts to another booking agent before their cancellation); *Commissioner v. Starr Bros.*, 204 F.2d 673 (2d Cir. 1953)

---

[12]The respective litigating positions of the taxpayers and respondent have varied depending upon whether gains or losses were involved in the particular case. HEDGING AND/OR CORN PRODUCTS: *Trenton Cotton Oil Co. v. Commissioner*, 147 F.2d 33, 35 (6th Cir. 1945); *Stewart Silk Corp. v. Commissioner*, 9 T.C. 174 (1947); *Patton & Richardson, Inc. v. Commissioner*, T.C. Memo. 1981–288, affd. by unpublished order (4th Cir. 1982); *Lewis v. Commissioner*, T.C. Memo. 1980–334; *Hendrich v. Commissioner*, T.C. Memo. 1980–322. INVENTORY: *Faroll v. Jarecki*, 231 F.2d 281 (7th Cir. 1956), cert. denied 352 U.S. 830 (1956); *Hale v. Commissioner*, T.C. Memo. 1982–527.

(payment for distributor's terminating its exclusive contract with a manufacturer); *Bingham v. Commissioner*, 105 F.2d 971 (2d Cir. 1939) (reconveyance of mortgaged property and surrender of notes to maker thereof).

Without citing or discussing our recent opinion in *Hoover Co. v. Commissioner*, 72 T.C. 206 (1979), petitioner tracks almost exactly the arguments that we rejected in that case, including reliance on the Second Circuit contract release or discharge cases and reliance on a letter ruling issued April 8, 1974, in regard to a release in an option situation. 72 T.C. at 248–249. The *Hoover Co.* case involved forward sales agreements for foreign currency and offsetting foreign currency purchase contracts. There, the foreign currency sales agreements and purchase agreements were with the same bank and no money changed hands. The contracts there, as here, were simply "netted" against one another. There, too, the taxpayer argued that the "netting" of those contracts constituted a release of contract rights under *Pittston* and that line of cases. However, we held that there was no release[13] and that such offsetting contracts constituted a "closure" under section 1233[14] or a "sale or exchange" under the general capital gains provisions. 72 T.C. at 248–249. In reaching that result, we cited *Covington* with favor and did not in any way undercut the authority of *Covington* and its progeny involving commodity futures transactions.

Moreover, we do not agree with petitioner that *Covington*

---

[13]Petitioner may be trying to squeeze through the narrow aperture that he may think we left open in the *Hoover Co.* case in regard to the contract discharge or release cases. 72 T.C. at 249 n. 7. Whatever continuing vitality the cases there cited may still have, they are simply inapposite to the issue in this case.

[14]In the present case, both parties cite sec. 1233 dealing with short sales. Respondent suggests that the provision should be applied to closure of long positions as well as short positions. Petitioner suggests that the provision does not apply to long positions at all, that if the Court applies the section it will necessitate a Rule 155 computation to separate the loss from closure of long positions from the loss from closure of short positions, but in essence petitioner makes an argument that would effectively deprive sec. 1233 of any application in commodity futures transactions. As we and other courts have stated before, sec. 1233 is a very specific, detailed, and intricately interwoven tax statute which should not be extended by analogy beyond its own narrow sphere. *Carborundum Co. v. Commissioner*, 74 T.C. 730, 738 (1980); *American Home Products Corp. v. United States*, 222 Ct. Cl. 689, 601 F.2d 540, 550 (1979). In light of our holding on the sale or exchange issue, we need not, and do not, consider the precise manner in which sec. 1233 operates in the context of speculative commodity futures trading. See, however, *Smith v. Commissioner*, 78 T.C. 350, 373–376 (1982) (Court reviewed).

was wrongly decided. Petitioner points out that our opinion and that of the Fifth Circuit in *Covington* relied heavily upon cases sustaining the validity of commodities exchanges against challenges based on laws prohibiting wagering. *Chicago Board of Trade v. Christie Grain & Stock Co.*, 198 U.S. 236 (1905); *Lyons Milling Co. v. Goffe & Carkener, Inc.*, 46 F.2d 241 (10th Cir. 1931). Those cases held that the clearinghouse transaction by which a trader enters into a new contract which he then offsets against his existing contract in an opposite position (e.g., the one he wishes to close) constitutes a constructive delivery, thereby avoiding prohibitions against wagering. "A set-off is a method by which a contract to purchase is set off against a contract to sell without the formality of an exchange of warehouse receipts or other actual delivery and, in legal effect, is a delivery." *Lyons Milling Co. v. Goffe & Carkener, Inc.*, *supra* at 247. "Set-off has all the effects of delivery." *Chicago Board of Trade v. Christie Grain & Stock Co.*, *supra* at 248. Petitioner argues against what he regards as this "legal fiction" of delivery. However, we are satisfied here, as we were in *Hoover Co.*, that the "constructive delivery" view espoused in the *Lyons Milling Co.*, and *Chicago Board of Trade* cases in fact comports with the economic reality of the commodity futures market. 72 T.C. at 249–250. By these offsetting transactions, petitioner has effectively transferred his rights to receive delivery and his obligations to deliver, and he has received or paid money as consideration for these transfers.

Petitioner's argument that there is no sale or exchange simply ignores a basic aspect of commodity futures trading, namely, that there is a buyer for every seller, and a seller for every buyer. Thus, when a trader closes a long position by acquiring a short position to offset it, another trader acquires an open long position identical to the one that the first trader closes. Likewise, when the first trader closes a short position by acquiring a long position to offset it, that other trader acquires an open short position identical to that being closed by the first trader. The economic reality is the same in both instances—the first trader has sold his long or short position to the second trader, with the clearinghouse as an intermediary.

Petitioner's argument concentrates on the mechanical details of how the commodity exchanges and their clearinghouses handle their records and their dealings with clearing

members. However, that does not affect the substance of the transaction between an individual buyer and seller of commodity futures. The purpose of offsetting is to permit an investor such as petitioner to close his transactions through the clearinghouse as an intermediary rather than through individual investors holding opposite positions. This elimination of direct contact between buyer and seller through the clearinghouse as a middleman facilitates the flow and transfer of funds on the markets, and, by negating the economic power of a single large buyer or seller, helps the futures markets to remain more competitive. See M. Powers & D. Vogel, Inside the Financial Futures Market 23–25 (1981); M. Powers, "The Economic Function of Futures and Options Markets and the New Financial Instrument Contracts," printed in Commodities and Futures Trading 1977, at 11–17 (P.L.I. 1977). Whatever useful functions the commodity exchanges and clearinghouses may serve, we cannot concentrate on the mechanics of their operations, as petitioner would have us do, to the exclusion of the substance of the transactions between individual buyers and sellers of commodity futures.

As we pointed out at the outset of this opinion, both the Supreme Court and the Congress have had occasions to deal with commodity futures transactions, have treated them as capital transactions thus presupposing a "sale or exchange," and have never questioned our *Covington* or *Battelle* cases in which we found a "sale or exchange" in the "netting" or "offsetting" mechanism of the commodity exchanges. In the landmark *Corn Products* case in 1955, the Supreme Court even then was facing a consistent 20-year practice by respondent and the lower courts, whereby speculative transactions in commodity futures received capital treatment, and hedging transactions in commodity futures received ordinary treatment. The Supreme Court cited our *Battelle* case as part of that consistent practice. 350 U.S. at 53 n. 8. Moreover, the Congress, too, has assumed that gains and losses from speculative commodity futures transactions are capital in nature as

shown by the 1950 legislative history of the predecessor of section 1233 dealing with short sales of property[15] and by the legislative history of the recent legislation dealing with commodity futures and eliminating certain abusive practices involving commodity tax straddles.[16]

In addition to addressing abusive commodity tax straddles, the Congress in the Economic Recovery Tax Act of 1981 also considered forward contracts for foreign currency of the type involved in our *Hoover* case (72 T.C. 206), and enacted a new section 1234A. Sec. 507(a), Economic Recovery Tax Act of 1981, Pub. L. 97–34, 95 Stat. 172, 333. Section 1234A, entitled "Gains or Losses from Certain Terminations," provides that:

> Gain or loss attributable to the cancellation, lapse, expiration, or other termination of a right or obligation with respect to personal property (as defined in section 1092(d)(1)) which is (or on acquisition would be) a capital asset in the hands of the taxpayer shall be treated as gain or loss from the sale of a capital asset.

In the legislative history of this new section, Congress expressly disapproved of the result in cases such as *Commissioner v. Pittston Co.*, 252 F.2d 344 (2d Cir. 1958), cert. denied 357 U.S. 919 (1958), in which dispositions by lapse, cancellation, or abandonment of contract rights were treated as producing ordinary income or loss even though such dispositions were economically equivalent to a sale or exchange of a capital asset. S. Rept. 97–144 (1981), 1981–2 C.B. 412, 480.

The legislative history specifically discussed cancellation of forward contracts for foreign currency and expressly provided for sales or exchange treatment just as we had found in *Hoover Co.* The new section 1234A is applicable only to property acquired or positions established after June 23, 1981, and thus has no application to the present case. Whether new section 1234A is viewed as a change in the law in some areas or as merely removing all doubt that sales or exchange treatment is

---

[15]H. Rept. 2319, 81st Cong., 2d Sess. 54–56, 94, 96 (1950), 1950–2 C.B. 380, 421–422, 447–449; S. Rept. 2375, 81st Cong., 2d Sess. 44–45, 85–88 (1950), 1950–2 C.B. 483, 515–516, 544–546.

[16]See Economic Recovery Tax Act of 1981, secs. 501(a), 503(a), Pub. L. 97–34, 95 Stat. 172, 323–326, 327–330, enacting new secs. 1092 and 1256. The legislative history of these provisions shows that the Congress viewed speculative transactions in commodity futures as capital in nature. H. Rept. 97–201 (1981); S. Rept. 97–144 (1981), 1981–2 C.B. 412, 468–477; H. Rept. 97–215 (Conf.) (1981), 1981–2 C.B. 481, 512–513.

to be accorded to certain dispositions of property, we think Congress clearly did not intend to upset the sale or exchange treatment that had long been accorded to speculative commodity futures transactions of the type involved in the present case. See *Smith v. Commissioner*, 78 T.C. 350, 394–395 (1982) (Court reviewed).

In light of the longstanding, consistent administrative and judicial treatment of speculative commodity futures transactions as capital transactions and Congress' acquiescence in, and reliance upon, that treatment, we decline to reopen what we regard as a settled area of the tax law. Petitioner here presents essentially the same argument on essentially identical facts as did the taxpayers in *Covington v. Commissioner, supra*. We think the narrow "sale or exchange" issue raised by petitioner was settled by our *Covington* opinion over 40 years ago and was reaffirmed in principle by our recent *Hoover* opinion. Nothing in new section 1234A or its legislative history would justify upsetting that settled law.

To reflect the foregoing,

*Decision will be entered for the respondent.*