[No. A120492. First Dist., Div. Five. Apr. 15, 2009.]

GENERAL MILLS et al., Plaintiffs and Appellants, v. FRANCHISE TAX BOARD, Defendant and Respondent.

**COUNSEL**

Morrison & Foerster, Andres Vallejo, Scott M. Reiber and Paul H. Frankel for Plaintiff and Appellant.

Edmund G. Brown, Jr., Attorney General, Randall P. Borcherding and Joyce E. Hee, Deputy Attorneys General, for Defendant and Respondent.

**OPINION**

STEVENS, J.[*]—This appeal presents the issue of whether commodity futures sales that are made to hedge against price fluctuations should be included in the sales factor of the Uniform Division of Income for Tax Purposes Act (Rev. & Tax. Code, § 25120 et seq.; UDITPA) apportionment formula. We conclude that, in the tax years at issue, the full sales price of these futures contracts (number of bushels times price per bushel) are gross receipts within the meaning of the UDITPA sales factor and we vacate the trial court's denial of the taxpayer's claims for refund.

[*]Retired Associate Justice of the Court of Appeal, First Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

BACKGROUND

General Mills and its subsidiary corporations (hereafter, General Mills) seek refunds from California's Franchise Tax Board for the tax year ending May 31, 1992, through the tax year ending May 25, 1997. Because General Mills is a unitary group of corporations operating both within and outside of California, the proportion of its income that is subject to California taxation is determined by the UDITPA. The Franchise Tax Board calculates General Mills's total business income[1] (as distinguished from its nonbusiness income), and uses an apportionment formula to determine the percentage of the income that will be subject to California taxation. (Rev. & Tax. Code, §§ 25120, subds. (a), (d), 25128.)[2]

The apportionment formula recognizes three factors: property, payroll, and sales. (§ 25128.)[3] Each factor is a fraction where the numerator is the amount attributable to California and the denominator is the total amount. (§§ 25129, 25132, 25134.) When combined,[4] the factors establish the fraction (apportionment percentage) of the unitary business's total business income that is subject to California taxation. (§ 25128.) Collectively, the property, payroll and sales factors are intended to represent the taxpayer's business activity within California. (See § 25137.) If the taxpayer or the Franchise Tax Board can demonstrate that the factors do not fairly represent the taxpayer's business activity within California, the taxpayer may request and the Franchise Tax Board may require that an alternative allocation and apportionment formula be applied. (§ 25137; see generally *Microsoft, supra,* 39 Cal.4th at pp. 755–757.)

Only the sales factor is at issue in this litigation. As to the sales factor, the only issue is the treatment of General Mills's sales on commodity futures markets. All of those sales take place outside of California and affect only the denominator of the sales factor. Any increase in the denominator of the sales factor decreases the percentage of General Mills's business income that is taxable in California. That is, it reduces General Mills's California taxes.

---

[1] " 'Business income' means income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations." (Rev. & Tax. Code, § 25120, subd. (a).)

[2] All statutory references are to the Revenue and Taxation Code unless otherwise indicated.

[3] Currently, the apportionment formula is defined as follows: "[A]ll business income shall be apportioned to this state by multiplying the business income by a fraction, the numerator of which is the property factor plus the payroll factor plus twice the sales factor, and the denominator of which is four, except as provided in subdivision (b) or (c)." (§ 25128, subd. (a).)

[4] As originally enacted, the UDITPA required the three factors (fractions) to be averaged to determine the apportionment percentage, but in 1993 the Legislature changed the formula to double-weight the sales factor (i.e., the property factor plus the payroll factor plus twice the sales factor are divided by four). (See § 25128, subd. (a); *Microsoft Corp. v. Franchise Tax Bd.* (2006) 39 Cal.4th 750, 756, fn. 5 [47 Cal.Rptr.3d 216, 139 P.3d 1169] (*Microsoft*).)

For tax years beginning before January 1, 2011, the UDITPA defines "sales" as "all gross receipts of the taxpayer" not allocated as nonbusiness income. (§ 25120, subd. (e).)[5] General Mills argues that the full sales price of each of its futures sales contracts (i.e., the number of bushels sold under the contract multiplied by the price per bushel in the contract) should be counted as gross receipts for purposes of calculating the sales factor, regardless of whether the contract results in actual physical delivery of the commodity, is offset before delivery, or is used to offset an open futures purchase contract. (We describe "offset" below.) The Franchise Tax Board maintains that no amount from these futures sales contracts should be counted as gross receipts in the sales factor.

We will first describe General Mills's trading activity on the commodity futures markets. As the parties agree the relevant facts are undisputed, our description is based on the parties' joint stipulation of facts and trial court testimony and exhibits. We then describe how General Mills accounts for the transactions in its financial books and on its tax returns, as well as the procedural background of this appeal. Finally, we address the substance of the appeal.

*General Mills's Futures Trading*

General Mills is engaged in the principal trade of manufacturing and marketing branded, finished consumer food products. It also sells raw grain and grain products to third parties.

The company engages in futures trading as a hedger. As we will explain, the process of hedging protects it against the risk of fluctuations in the price of agricultural commodities General Mills uses in its business. To understand General Mills's hedging transactions, we define several concepts involved in

---

[5] On February 20, 2009, the Governor signed into law an amendment to section 25120 that provides, "For taxable years beginning on or after January 1, 2011: [¶] (1) 'Sales' means all gross receipts of the taxpayer not allocated under Sections 25123 to 25127, inclusive. [¶] (2) 'Gross receipts' means the gross amounts realized (the sum of money and the fair market value of other property or services received) on the sale or exchange of property, the performance of services, or the use of property or capital (including rents, royalties, interest, and dividends) in a transaction that produces business income, in which the income, gain, or loss is recognized (or would be recognized if the transaction were in the United States) under the Internal Revenue Code, as applicable for purposes of this part. Amounts realized on the sale or exchange of property shall not be reduced by the cost of goods sold or the basis of property sold. Gross receipts, even if business income, shall not include the following items: [¶] . . . [¶] (L) Amounts received from hedging transactions involving intangible assets. A 'hedging transaction' means a transaction related to the taxpayer's trading function involving futures and options transactions for the purpose of hedging price risk of the products or commodities consumed, produced, or sold by the taxpayer." (§ 25120, subd. (f), added by Stats. 2009, 3d Ex. Sess., ch. 10, § 10, ch. 17, § 10.)

Because this statute was not in effect in the tax years at issue in this appeal, we do not consider the meaning of this new statutory definition of "gross receipts" and new exclusion for amounts received from hedging transactions. Hereafter, when we refer to the UDITPA's requirements, we refer to the requirements that apply to tax years beginning before January 1, 2011.

the hedging process. A futures contract is "an agreement to purchase or sell a commodity for delivery in the future: (1) at a price that is determined at initiation of the contract; (2) that obligates each party to the contract to fulfill the contract at the specified price; (3) that is used to assume or shift price risk; and (4) that may be satisfied by delivery or offset." " 'Offset' means liquidating a purchase of futures contracts through the sale of an equal number of contracts of the same delivery month, or liquidating a short sale of futures through the purchase of an equal number of [purchase] contracts of the same delivery month."

" 'Hedging' means (1) taking a position in the futures market opposite to a position held in the cash market to minimize the risk of financial loss from an adverse price change"; or (2) purchasing or selling commodities on the futures market as a temporary substitute for a cash transaction that will occur later. The purpose of hedging is to smooth out price fluctuations so General Mills can operate despite the price volatility in the agricultural commodities it uses to manufacture its consumer products. If General Mills did not hedge the price of grain, it would encounter severe fluctuations in its costs of goods. In such instances, General Mills would have to choose between selling at a loss or not selling at all, particularly for products such as flour where the cost of grain is about 85 percent of the selling price. Although General Mills may not make any profit on its futures trades, and may in fact experience a net loss, it would not be able to achieve its current profit margins on its ultimate product (e.g., flour and cereal) sales without the price protection of hedging. General Mills's hedging activities contributed to its business income for each of the tax years in issue.

In 97 percent of its futures transactions, General Mills offsets the original futures contract rather than letting the contract result in actual delivery of the commodity, and it obtains almost all of the commodities it needs for manufacturing on the cash market. All of General Mills's futures trades are triggered by planned or actual purchases or sales of commodities in the cash market. Futures exchange rules, Commodity Futures Trading Commission policy, and General Mills's internal risk management policy require futures trading volume to match General Mills's commitments in the cash market.

*Mechanics of the Futures Market*

The mechanics of the futures market include trading platforms (physical locations or computerized networks) where buyers and sellers or their brokers agree to buy and sell a certain amount of a commodity at a certain price in a given month, and a clearinghouse that thereafter acts as the counterparty for the transactions and assumes the credit risk that traders will default on their contracts. The clearinghouse becomes the buyer for each seller and the seller for each buyer. (See *Vickers v. Commissioner* (1983) 80 T.C. 394, 399–400

(*Vickers*) [describing mechanics of futures exchanges].) Traders must maintain margin accounts with the clearinghouse in order to trade on a futures exchange. That is, they must deposit money or collateral as a performance bond to ensure that they can meet their financial obligations, typically between 2 percent and 10 percent of the value of their outstanding contracts.[6] At the end of each trading day, all "open positions" (i.e., outstanding futures purchase or sales contracts that have not been satisfied or "closed" by offset or delivery) on a futures exchange are "marked to market" at the end-of-day settlement price, with net gains and losses posted to the trader's margin account.[7] If a futures contract is offset, the only money exchanged is through the mark-to-market process; no other money changes hands and no commodities are delivered.

*General Mills's Books and Tax Returns*

Consistent with Generally Accepted Accounting Principles and Securities and Exchange Commission requirements, which apply to financial as distinct from tax accounting, General Mills includes its futures and forward sales as adjustments to costs of goods rather than sales in its annual reports and financial statements. Similarly, on its federal tax returns General Mills includes its futures and forward sales as adjustments in its costs of goods rather than sales. When General Mills filed its initial California tax returns for the tax years in issue, it did not include amounts from its futures trading in the UDITPA sales factor.

Between 2000 and 2003, General Mills amended its California tax returns for the tax years in issue[8] and claimed tax refunds. In recalculating its tax

---

[6] The parties stipulated that " 'Margin' means the amount of money or collateral deposited by a customer with his broker, by a broker with a clearing member, or a clearing member with a clearing organization. The margin is not a partial payment on a purchase. Also called a Performance Bond. (1) Initial margin is the amount of margin required by the broker when a futures position is opened; (2) Maintenance margin is an amount that must be maintained on deposit at all times. If the equity in a customer's account drops to or below the level of maintenance margin because of adverse price movement, the broker must issue a margin call to restore the customer's equity to the initial level."

[7] The parties stipulated: " 'Mark-to-market' means part of the daily cash flow system used by the United States futures exchanges to maintain a minimum level of margin equity for a given futures or option contract position by calculating the gain or loss in each contract position resulting from changes in the price of the futures or option contracts at the end of each trading session. These amounts are added or subtracted to each account balance."

The parties also stipulated, " 'Settlement price' means the daily price at which the clearing organization clears all trades and settles all accounts between clearing members for each contract month. Settlement prices are used to determine both margin calls and invoice prices for deliveries. The term also refers to a price established by the exchange to even up positions which may not be able to be liquidated in regular trading."

[8] Tax years ending May 31, 1992 (TYE 1992), May 30, 1993 (TYE 1993), May 29, 1994 (TYE 1994), May 28, 1995 (TYE 1995), May 26, 1996 (TYE 1996), and May 25, 1997 (TYE 1997).

obligation, General Mills included the full sales price (i.e., the number of bushels of the commodity multiplied by the price per bushel in the contract) of all of its futures sales contracts in the denominator of the sales factor pursuant to section 25128, subdivision (a). The increase in the sales factor denominators changed the apportionment formulas from about 10.9 percent to 10.5 percent for TYE 1992, from 11.2 percent to 10.8 percent for TYE 1993, from 11 percent to 10.3 percent for TYE 1994, from 10.4 percent to 9.5 percent for TYE 1995, from 10.8 percent to 9.3 percent for TYE 1996, and from 10.2 percent to 8.9 percent for TYE 1997. Under these reduced apportionment percentages, General Mills would be entitled to a total refund of $2,657,973.

*Claims for Refund and Tax Refund Litigation*

In early 2005, the Franchise Tax Board denied the refund claims, refusing to include any receipts from General Mills's futures sales contracts in the sales factor denominator. On March 29, 2005, General Mills filed a complaint for a refund pursuant to section 19382. The parties agreed on a joint stipulation of facts and various witnesses testified at a court trial.

The trial court concluded that General Mills's receipts from futures trading should not be included in the sales factor at all: "Under the plain language of UDITPA, the Court concludes futures trading does not qualify as 'sales income' and cannot be used for tax apportionment purposes. . . . Testimony established that at inception, futures have no value. Rather they acquire value when 'marked to market' daily, at which point they are zeroed out. Because futures have no value at inception, they cannot qualify as the 'total amount of money' received under *Microsoft*'s 'gross receipts' definition. Secondly, the nature of futures is revocable at any time prior to delivery. If futures are an 'obligation' to buy or sell a commodity in the future, GENERAL MILLS has not established that this obligation is binding, i.e. that withdrawal or defection from this obligation is legally prohibited or necessarily entails a legal consequence for the party withdrawing. . . . [T]herefore futures contracts cannot be said to be supported by consideration . . . ." Although the court did not reach the section 25137 issue, it cited evidence demonstrating "that great potential exists for a finding of distortion under" the statute. General Mills's claims for tax refunds were denied.

DISCUSSION

We consider whether and to what extent General Mills's receipts from its futures sales contracts should be included in the sales factor of the standard apportionment formula and, if any, whether a different formula could be imposed under section 25137. General Mills takes the position that the full sales price (number of bushels times price per bushel) of all of its futures sales contracts (whether opening or closing and if opening whether closed by offset or delivery) should be included and that no alternative formula may be

imposed under section 25137. The Franchise Tax Board defends the trial court's position that no receipts from futures sales contracts should be included in the sales factor under the standard apportionment formula. Alternatively, it argues that only net gains on futures (purchase or sales) contracts should be included in the sales factor under the standard formula and that it properly imposed the alternative formula of including *no* receipts from General Mills's futures trades pursuant to section 25137.

### I.  *The UDITPA Sales Factor*

The UDITPA defines " 'sales' " as "all gross receipts of the taxpayer not allocated [as nonbusiness income]." (§ 25120, subd. (e).)[9] A regulation interpreting section 25120, subdivision (e) reads, "[T]he term 'sales' means all gross receipts derived by the taxpayer from transactions and activity in the regular course of such trade or business." (Cal. Code Regs., tit. 18, § 25134, subd. (a)(1).)

The meaning of "gross receipts" has been considered in two recent cases by the California Supreme Court: *Microsoft, supra,* 39 Cal.4th 750 and *General Motors Corp. v. Franchise Tax Bd.* (2006) 39 Cal.4th 773 [47 Cal.Rptr.3d 233, 139 P.3d 1183] (*General Motors*). In *General Motors,* "[g]ross receipts" was defined as " '[t]he total amount of money or other consideration received by a business taxpayer for goods sold or services performed in a year, before deductions.' [Citations.]" (*General Motors,* at p. 786.) The *Microsoft* court explained that " '[g]ross' implies the whole amount received, not just the amount received in excess of the purchase price. To only consider the net price difference as 'gross receipts' is an awkward fit with the statutory language, at best. To the extent the language is ambiguous, we generally will prefer the interpretation favoring the taxpayer. [Citation.]" (*Microsoft, supra,* 39 Cal.4th at p. 759, fn. omitted.) Considering the legislative history of the UDITPA, the decision pointed out that the drafters rejected a definition of " 'sales' " as " 'all income of the taxpayer,' " instead defining " 'sales' " as " 'all gross receipts of the taxpayer.' " (*Microsoft,* at p. 760.) "This amendment suggests the choice of 'gross receipts' was intentional and the drafters had in mind a definition of 'sales' that encompassed more than just gross income." (*Ibid.*)

The court also held, "In deciding how to apply section 25120 [which defines 'sales'], we look as well to the economic reality of the taxed transaction. For purposes of taxation, what matters is substance, not form. 'In applying this doctrine of substance over form, the [United States Supreme]

---

[9] Neither party contends that General Mills's commodity futures sales generate nonbusiness income.

Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed.' [Citation.] Thus, we focus on the actual rights and benefits acquired, not the labels used." (*Microsoft, supra,* 39 Cal.4th at p. 760.) *Microsoft* found that the redemption of a short-term marketable security at maturity was equivalent to a sale of the security to a third party before maturity when the transaction was evaluated from the perspective of the taxpayer. Therefore, the entire amount received upon redemption (which included the initial capital outlay) was "gross receipts" for purposes of calculating the UDITPA sales factor. (*Microsoft,* at pp. 757, 761.) On the other hand, *General Motors* concluded that a repurchase agreement—a hybrid of the sale of a security and a secured loan—should be characterized as a secured loan for purposes of the UDITPA sales factor and repayment of the loan should not be counted as "gross receipts." (*General Motors, supra,* 39 Cal.4th at pp. 785–787.) The court reached this conclusion by examining the transaction once again from the perspective of the taxpayer. (*Id.* at p. 787.)

## II. *General Mills's Futures Sales*

Following the Supreme Court's analysis in *Microsoft, supra,* 39 Cal.4th 750 and *General Motors, supra,* 39 Cal.4th 773, we conclude the full sales price (number of bushels times price per bushel) of all of General Mills's futures sales contracts should be counted as gross receipts in the UDITPA sales factor. Inasmuch as the facts regarding General Mills's futures trading activity are undisputed, application of the UDITPA to these undisputed facts is a question of law and our review is de novo. (*Microsoft, supra,* 39 Cal.4th at p. 758.)

### A. *A Futures Sales Contract Is a Legally Binding Obligation to Sell a Commodity and a Trader Receives Consideration at Offset*

The record establishes that a futures sales contract is a legally binding obligation to deliver a specified amount of a specified commodity at a specified price in a specified month. The parties stipulated that a futures contract is "an agreement to purchase or sell a commodity for delivery in the future . . . that obligates each party to the contract to fulfill the contract at the specified price . . . [and] that may be satisfied by delivery or offset." And the Franchise Tax Board's leading expert witness (whose testimony provided the framework for the trial court's decision) acknowledged at trial that if a trader is still holding a futures contract on the contract's delivery date, the trader is obligated to deliver or accept delivery of the commodity at that date.

It is also well established as a matter of law that futures contracts are binding contracts. (*Board of Trade v. Christie Grain & Stock Co.* (1905) 198 U.S. 236, 248–249 [49 L.Ed. 1031, 25 S.Ct. 637] ["There is no doubt . . . that the contracts made between the members [of the futures exchange] are intended and supposed to be binding in manner and form as they are made."]; *Lyons Milling Co. v. Goffe & Carkener* (10th Cir. 1931) 46 F.2d 241, 247; *Commissioner of Internal Revenue v. Covington* (5th Cir. 1941) 120 F.2d 768, 770; *Cargill, Incorporated v. Hardin* (8th Cir. 1971) 452 F.2d 1154, 1156; *Hoover Co. v. Commissioner* (1979) 72 T.C. 206, 249; *Vickers, supra*, 80 T.C. at p. 397.)[10]

When a futures contract is offset, the offsetting party is relieved of its binding obligation to purchase or sell the commodity at the price stated in the offset contract. Relief from that obligation constitutes consideration under the offsetting contract. That is, when General Mills offsets a futures sales contract with an equivalent futures purchase contract, it receives consideration in the amount of the full sales price of the sales contract: it has been relieved of the obligation to sell the number of bushels of the commodity identified in the contract in the contract delivery month. When General Mills offsets a futures purchase contract with an equivalent futures sales contract, it has been relieved of the obligation to receive and pay for the number of bushels of the commodity identified in the contract in the delivery month. (General Mills counts only the sales contract in each example.)

The Franchise Tax Board argues that, rather than providing consideration for the offset contract, offset *terminates* the transaction and makes it "disappear" from the economy. The Board focuses on the fact that upon offset the trader's outstanding obligation *to the exchange* is eliminated. However, this is a result of the mark-to-market process and does not reflect the economic reality of the transaction for purposes of UDITPA. When a trader offsets a futures contract, the original counterparty to the contract is not left out in the cold. Instead, the exchange effectively matches the buyer up with another seller of the same amount of the commodity in the same delivery month and charges the buyer the same price as was stated in the original contract. In effect, the obligation to deliver the commodity is transferred to another party; it has not disappeared from the economy. (See *Vickers, supra*, 80 T.C. 394, 408

---

[10] The Franchise Tax Board claims these federal tax cases are inapplicable since they are factually distinguishable from this one. However, we cite them not for their specific holdings regarding gambling or capital assets treatment under federal income tax law, but for their conclusions concerning the economic reality of futures transactions, which we find are equally applicable to the UDITPA context under review.

[at offset, trader "has effectively transferred his rights to receive delivery and his obligations to deliver" under the contract].) In a similar vein, the Franchise Tax Board claims the contracts are not legally binding obligations because they are revocable at will. That is not the case. While the *exchange* need not consent to an offsetting transaction, the trader cannot act unilaterally but must find a counterparty (a willing buyer or seller) on the trading platform who will enter into the offsetting transaction.

The Franchise Tax Board claims that futures contracts have no value at inception and that their value returns to zero at the end of every business day. It follows, the Board reasons, that offsetting a futures contract does not involve the transfer of value for which the offsetting trader receives consideration. Again, the Board misconstrues the mark-to-market process. Futures contracts have "no value" at inception only in the sense that, assuming infinite supply, another trader could enter into the same contract (for the same amount of the same commodity at the same price in the same delivery month) on the trading platform and thus would not pay anything *additional* to obtain the contract from a trader who already holds it. The contract would still have value because it creates a legally binding obligation for the counterparty to purchase or sell the commodity in the delivery month. Similarly, even though the mark-to-market process credits or debits a trader on its gains or losses as the sales price for the commodity shifts over time, it is incorrect to say the value of the contract returns to zero at the end of the business day since the underlying value of the contract (the right to buy or sell the commodity in the delivery month) remains intact until offset or delivery. On offset, the offsetting trader gives up the value of the contract (e.g., the right to receive the amount of a commodity identified in a futures purchase contract in a particular month) and receives consideration in the form of relief from the corresponding obligation (e.g., the obligation to accept delivery and pay for the commodity in that month).

In sum, the economic reality of an *opening futures sales contract* from the perspective of the taxpayer is that the taxpayer enters into an obligation to sell a set quantity of a commodity in a specified delivery month and either delivers that commodity and receives cash consideration, or offsets the contract and receives consideration in the form of being relieved of the obligation to deliver the commodity. The economic reality of a *closing futures sales contract* (which is used to offset an open futures purchase contract) is that the taxpayer, who is already legally obligated to purchase a set quantity of a commodity in a specified delivery month, is relieved of that obligation. In all of these circumstances, the trader receives "gross receipts" (" 'money or other consideration received by a business taxpayer for goods sold' "). (*General Motors, supra,* 39 Cal.4th at p. 786.)

B. *Including Futures Sales in the Sales Factor Is Consistent with the Purpose of UDITPA*

■ The UDITPA sales factor is designed to reflect the taxpayer's "income producing activity," which regulations define as "transactions and activity directly engaged in by the taxpayer in the regular course of its trade or business for the ultimate purpose of obtaining gains or profit." (Cal. Code Regs., tit. 18, § 25136, subd. (b); see Rev. & Tax. Code, §§ 25134–25136.) General Mills's futures sales satisfy this definition. Its employees engage in futures trading (instructing brokers to enter into specified contracts) on a daily basis to hedge its actual or planned purchases of raw commodities that it will either resell for profit or process into flour or consumer food products to be sold for profit. Hedging allows General Mills to stay in business and make a profit despite frequent and significant fluctuations in the prices of the raw commodities. That is, hedging futures sales are made "for the ultimate purpose of obtaining gains or profit," even though General Mills does not seek to make a profit on the futures trades alone. As the United States Supreme Court has written, "it is difficult to imagine a program more closely geared to a company's manufacturing enterprise or more important to its successful operation" than hedging in raw commodities on the futures market. (*Corn Products Co. v. Commissioner* (1955) 350 U.S. 46, 50 [100 L.Ed. 29, 76 S.Ct. 20].)

■ The Franchise Tax Board also makes the argument that receipts from futures trades should be considered adjustments in General Mills's costs of goods rather than sales because the company engages in hedging as a form of price insurance, not as a profit-making venture, and it accounts for its trades as adjustments in its costs of goods on its financial statements and federal tax returns. We disagree. First, the company's financial accounting treatment of the trades is not binding for tax purposes. Financial and tax accounting have "vastly different objectives." (*Thor Power Tool Co. v. Commissioner* (1979) 439 U.S. 522, 542 [58 L.Ed.2d 785, 99 S.Ct. 773].) Second, UDITPA "sales" include many receipts that are not counted as "sales" on financial statements or federal tax returns and that do not fit the ordinary understanding of the word "sales," including royalties and rental income. (Cal. Code Regs., tit. 18, § 25136, subd. (b)(1).) Moreover, many transactions that do not generate profit are nevertheless included in "sales" for UDITPA purposes, such as sales to consumers at cost or at a loss that are designed to bring customers into a store or promote the company's products and thus ultimately generate profit for the company. (See *Royal Crown Cola Co.* (1974) 74 SBE 047 [Cal. Tax Rptr. (CCH) ¶ 205-168; 1974 Cal. Tax Lexis 4] [unprofitable sales must be included in sales factor]; *Hammond Organ Co.* (1962) 62 SBE 025 [Cal. Tax Rptr. (CCH) ¶ 201-928; 1962 Cal. Tax Lexis 67] [promotional activity must be included in sales activity].)

██ Because it requires hedging in commodity futures contracts (to protect against price fluctuations) and cash market transactions (the physical delivery of raw commodities) to acquire the goods General Mills needs to manufacture its consumer food products, both forms of transactions are an integral part of the company's business activity.

### C. *Gross Receipts Should Be Measured by the Full Sales Price of the Futures Sales Contracts*

Applying the plain language of the statute, we conclude that General Mills's "gross receipts" from a futures sales contract are equivalent to the full sales price of the contract. "Gross" means the full amount received, not the company's net gain on the transaction or "gross income" from the transaction. (*Microsoft, supra,* 39 Cal.4th at pp. 759–760.) When a futures sales contract results in a physical delivery, General Mills receives the full sales price in cash (in part through the mark-to-market process and in part upon delivery). When a futures sales contract results in offset or when the company offsets an open futures purchase contract, General Mills receives consideration in the form of being relieved of the obligation to purchase or sell the commodity under the contract. That consideration, in combination with any sums General Mills received through the mark-to-market process, equals the full sales price of the contract. The Franchise Tax Board's proposed methodology—counting only net gains on futures contracts—is facially inconsistent with the "gross receipts" definition of sales.

### D. *Conclusion*

██ The full sales price of General Mills's hedging futures sales contracts are "gross receipts" to be included in the calculation of the UDITPA sales factor. A remaining issue, which the trial court did not reach, is whether the Franchise Tax Board met its burden of proving that the apportionment formula does not then "fairly represent" General Mills's business activity within California, thus warranting imposition of an alternative formula pursuant to section 25137. In *Microsoft,* the Supreme Court held that an alternative formula could be imposed under section 25137 if the challenged activity both qualitatively differs from the taxpayer's principal business and quantitatively distorts the formula by a substantial amount (in that case "cutting Microsoft's California income tax nearly in half"). (*Microsoft, supra,* 39 Cal.4th at pp. 757, 766; *Limited Stores, Inc. v. Franchise Tax Bd.* (2007) 152 Cal.App.4th 1491, 1497 [62 Cal.Rptr.3d 191].) We remand for the trial court to rule on these questions.

DISPOSITION

The judgment denying General Mills's claims for tax refunds is vacated. The case is remanded to the trial court for further proceedings consistent with the views expressed in this opinion. The Franchise Tax Board shall pay General Mills's costs on appeal.

Jones, P. J., and Simons, J., concurred.

Respondent's petition for review by the Supreme Court was denied July 29, 2009, S173180. Corrigan, J., did not participate therein. Kennard, J., and Moreno, J., were of the opinion that the petition should be granted.